UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WELLINGTON DA MATA,

               Plaintiff,

        -v.-

CITY OF NEW YORK, TERRANCE WILLIAMS,
and JOHN OR JANE DOE 1-10,

            Defendants.

---

21 Civ. 155 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Wellington Da Mata ("Plaintiff") was arrested by New York City Police Department ("NYPD") Detective Terrance Williams ("Williams") on suspicion of stealing two gem-cutting machines from Plaintiff's place of work. Three months later, the criminal case brought against Plaintiff by the Manhattan District Attorney's Office was dismissed, after Plaintiff presented evidence that he was in fact the owner of the gem-cutting machines. In the instant action, Plaintiff brings a litany of federal and state claims alleging, *inter alia*, that he was falsely arrested and imprisoned, that he was maliciously prosecuted, and that Williams and the City of New York (together with Williams, "Defendants") violated his equal protection rights.[1] For the reasons

---

[1] Plaintiff's Complaint speaks generally to "Defendants" beyond Williams in its causes of action. Williams and the City of New York are the only named Defendants in this case, and Defendants' briefing assumes that the only live claims are against Williams and the City. Courts in this Circuit routinely dismiss claims brought against Doe defendants for failure to prosecute where "discovery has closed and the [p]laintiff has had ample time and opportunity to identify and serve John Doe [d]efendant[s][.]" *Delrosario* v. *City of New York*, No. 07 Civ. 2027 (RJS), 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (citing *Coward* v. *Town and Village of Harrison*, 665 F. Supp. 2d 281, 300-01 (S.D.N.Y. 2009); *Jeanty* v. *County of Orange*, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y. 2005)); *cf. Willey* v. *Kirkpatrick*, 801 F.3d 51, 71-72 (2d Cir. 2015) ("We show a 'special solicitude'

set forth in the remainder of this Opinion, the Court grants Defendants' motion for summary judgment as to all of Plaintiff's claims.

## BACKGROUND[2]

### A.   Factual Background

#### 1.   The Events Leading to Plaintiff's Arrest

On February 17, 2019, Maykel Rieth ("Complainant"), Vice President of R. Gems Inc. ("R. Gems"), filed a complaint with the NYPD in which he reported that Plaintiff, his employee, had stolen two gem-cutting machines valued at $7,000 from R. Gems's business premises.  (Def. 56.1 ¶ 1; Gosling Decl., Ex. B).  The complaint was taken by Officer Michael Lennon, a non-party to this action.  (Gosling Decl., Ex. B).  The complaint noted that the alleged theft was caught on video cameras at the jewelry store, and that Complainant would make copies of the video by the end of the day.  (*Id.*).

Thereafter, Williams was assigned to investigate Complainant's allegations.  (Def. 56.1 ¶ 2; Gosling Decl., Ex. C ("Williams Dep.") 39:3-21).  Prior to Williams assuming control over the case, Detective Thomas Donovan, a

---

toward [plaintiff] as a *pro se* litigant by keeping alive, for now, these claims for unsanitary conditions of confinement, which we would dismiss in a counseled complaint for failing to identify the responsible officers who acted with the requisite culpability." (internal citation omitted)).  Plaintiff is counseled in this case, and the Court finds that claims against the Doe Defendants should be dismissed.  As such, the Court proceeds to consider Plaintiff's claims against Williams and the City.

[2]     The facts alleged herein are drawn from Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #43)) and the Declaration of William T. Gosling and attached exhibits ("Gosling Decl." (Dkt. #44)).  Citations to Defendants' Rule 56.1 Statement incorporate by reference the documents cited therein.  Further, where facts stated in the Rule 56.1 Statement are supported by admissible evidence and are not contested by Plaintiff, the Court accepts such facts as true.  *See* Local Civil Rule 56.1(c)-(d).  For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion for summary judgment as "Def. Br." (Dkt. #45).

non-party, conducted a telephone interview with Complainant on February 18, 2019.  (Def. 56.1 ¶ 3).  This interview was memorialized in a complaint follow-up report (known as a "DD5," after the NYPD form on which it was memorialized), which notes that Detective Donovan interviewed Complainant, and that Complainant again averred that Plaintiff had stolen two gem-cutting machines from the jewelry store.  (Gosling Decl., Ex. D).  The February 18, 2019 DD5 further notes that Complainant had confronted Plaintiff about the alleged theft, and that Plaintiff had refused to return the gem-cutting machines.  (*Id.*).

After Detective Donovan's interview, Williams contacted Complainant by phone, the resulting conversation was not memorialized in a DD5.  (Williams Dep. 45:24-46:12, 49:16-50:2).  During that call, Williams "went over whatever [Complainant] said" in the DD5 prepared by Detective Donovan.  (*Id.* at 52:16-20).  Following this interview, Williams travelled to the R. Gems store to obtain the video footage of Plaintiff removing the allegedly stolen gem-cutting machines.  (Def. 56.1 ¶¶ 5-6).  Williams did record this trip on a DD5, which reflects that Williams collected the video footage of Plaintiff disassembling at least one gem-cutting machine, placing the parts into a plastic bag, and leaving the premises with the bag.  (Gosling Decl., Ex. E; *see also* Williams Dep. 59:10-18, 61:5-22 (testifying that Williams reviewed the footage at the store)).[3]  The video footage of Plaintiff indeed shows Plaintiff taking these actions in the

---

[3]     The parties' depositions are not perfectly clear as to whether the video footage shows Plaintiff disassembling and removing one or two machines.  At a minimum, the footage appears to show Plaintiff disassembling and removing at least one machine.

company of coworkers.  (Gosling Decl., Ex. F; *id.*, Ex. G ("Da Mata Dep.") 95:19-96:9).  At the beginning of the video, Complainant briefly walks by Plaintiff as he is holding the plastic bags containing machine components, albeit after Plaintiff had placed the parts into the bags.  (Gosling Decl., Ex. F; Da Mata Dep. 98:3-23, 99:3-11 (testifying that Complainant is seen in the video for approximately four seconds)).  Eventually, Plaintiff is seen putting on his coat, retrieving the plastic bags with the machine parts, and leaving the workspace. (Gosling Decl., Ex. F; Da Mata Dep. 100:3-101:3).

After reviewing the video footage at the store, Williams concluded that Plaintiff had in fact removed the gem-cutting machines from R. Gems. (Williams Dep. 67:4-15).  Williams also believed that Plaintiff committed a crime by removing the machines, because "any items that are in the [store] [are] the possession[s] of the store."  (*Id.* at 67:16-21; *see also id.* at 71:14-17 (testifying that Complainant told Williams that Plaintiff removed gem-cutting machines belonging to Complainant), 112:23-113:4 (testifying that Complainant claimed ownership over the machines, and that Plaintiff wrongly removed them)).  Williams did not further investigate Complainant's possessory interest in the gem-cutting machines.  (*See, e.g., id.* at 70:3-25, 73:4-23, 114:7-115:4, 123:3-8).  Eventually, Williams did speak with Detective Donovan regarding his interview with the Complainant, but not with Officer Lennon, who took the original complaint.  (*Id.* at 81:11-22).  Detective Donovan corroborated that Complainant told him that Plaintiff took his gem-cutting machines.  (*Id.* at 84:6-13).  Beyond the value of the gem-cutting machines noted in the

4

complaint, Williams did not independently verify that they were indeed worth $7,000. (*Id.* at 138:23-139:6).

Plaintiff's lawyer arranged for Plaintiff to turn himself in to the NYPD on February 25, 2019, in connection with these allegations. (Da Mata Dep. 66:21-67:4).[4] Plaintiff, accompanied by his lawyer, in fact turned himself in on February 27, 2019. (*Id.* at 67:9-19, 68:20-69:3). Williams then arrested Plaintiff upon the latter's arrival at the precinct. (Williams Dep. 90:4-14).[5] Plaintiff's lawyer instructed Williams not to initiate any conversations with Plaintiff, but did not explain to Williams Plaintiff's contention that the gem-cutting machines belonged to Plaintiff. (*Id.* at 105:19-106:10, 106:25-107:5). Plaintiff understood at the time of his arrest that he was being arrested because he was accused of stealing. (Da Mata Dep. 76:2-9). Plaintiff was not in possession of paperwork identifying the gem-cutting machines as his property, and never provided any documents to Williams or others, including the District Attorney's Office, showing that Plaintiff owned the machines. (*Id.* at 44:24-45:1, 84:2-21). Plaintiff was arrested on suspicion of grand larceny. (Gosling Decl., Ex. I).

Once he arrested Plaintiff at the NYPD precinct, Williams placed him in handcuffs. (Da Mata Dep. 70:11-15). While he was being transported to the

---

[4] There is a slight factual dispute between Plaintiff's and Williams's accounts regarding his decision to turn himself in. Williams testified that he called Plaintiff by phone on a number listed on the complaint and explained to Plaintiff that he needed to turn himself in to the NYPD. (Williams Dep. 86:2-21). Under either account, however, Plaintiff peacefully surrendered to the NYPD.

[5] Because of the circumstances of Plaintiff's surrender, NYPD officers never visited Plaintiff's home. (Da Mata Dep. 70:5-10).

cellblock underneath the precinct, Plaintiff complained to a woman who spoke Spanish that the handcuffs were too tight, but it is unclear whether the woman relayed the message to Williams.  (*Id.* at 71:17-72:17).  Williams removed the handcuffs once Plaintiff was in his cell, approximately twenty minutes after Williams initially placed the handcuffs on Plaintiff.  (*Id.* at 74:8-17).  Beyond the issues associated with the handcuffs, no NYPD officer ever used force against Plaintiff.  (*Id.* at 75:8-14).  Plaintiff spent approximately thirteen and a half to fourteen hours in jail as a result of the arrest.  (*Id.* at 103:11-13).

Following Plaintiff's arrest, Williams prepared an arrest report dated February 27, 2019.  (Williams Dep. 97:2-12; Gosling Decl., Ex. I).  The arrest report states that Complainant would make a copy of the video footage showing Plaintiff removing the gem-cutting machines from the store.  (Williams Dep. 156:13-157:19).  Williams testified that he copied this statement from the complaint, and as such the arrest report is inaccurate, insofar as Williams had already reviewed the video footage before arresting Plaintiff.  (*Id.*; *compare* Gosling Decl., Ex. B (initial complaint), *with id.*, Ex. I (arrest report)).

Williams learned for the first time of Plaintiff's claim that the gem-cutting machines belonged to him when the instant case was filed.  (Williams Dep. 107:6-22).  This is consistent with Plaintiff's account, insofar as Plaintiff testified that he never provided any paperwork substantiating his ownership of the machines until he presented such evidence to the judge presiding over his criminal case (Da Mata Dep. 86:2-87:1), by which time Williams was no longer involved (Williams Dep. 210:3-8).

### 2.   Plaintiff's Post-Arrest Proceedings

The criminal court complaint prepared on February 27, 2019, relies on statements from Williams, and charged Plaintiff with petit larceny.  (Gosling Decl., Ex. J; Def. 56.1 ¶¶ 17-18).  Among other factual assertions, the criminal court complaint recites that Williams observed video footage of Plaintiff removing a gem-cutting machine from R. Gems, and that Plaintiff did not have permission or authority to take the property.  (Gosling Decl., Ex. J).

On May 3, 2019, in the course of his criminal prosecution, Plaintiff presented an affidavit prepared by a friend to substantiate Plaintiff's claim of ownership of the gem-cutting machines.  (Def. 56.1 ¶ 19; Da Mata Dep. 86:13-21 ("I didn't have ownership papers, so I had to find friends who could testify."); Gosling Decl., Ex. K).  The presiding criminal court judge dismissed the case against Plaintiff on May 23, 2019.  (Def. 56.1 ¶ 20; Gosling Decl., Ex. L at 3; Da Mata Dep. 87:12-88:7).  On October 14, 2020, a different justice of the New York State Supreme Court denied Plaintiff leave to file a late notice of claim against the City of New York alleging false arrest, false imprisonment, illegal search and seizure, assault and battery, and malicious prosecution.  (Gosling Decl., Ex. L at 1).  The court applied the relevant 90-day statute of limitations to the claims, and found that Plaintiff's petition was made outside a "reasonable time" following accrual of the claims.  (*Id.* at 3).

### 3.   Plaintiff's and Williams's Relationships with Complainant

Plaintiff and Complainant share a complicated history predating Complainant's accusations.  For example, Plaintiff was living at a home owned

7

by Complainant or Complainant's mother in February 2019, when
Complainant made his accusations to the NYPD. (Da Mata Dep. 32:10-33:19).
Complainant deducted rent from Plaintiff's R. Gems paycheck. (*Id.*). And
Complainant lived at this home while Plaintiff leased space within it. (*Id.* at
33:25-34:2). Moreover, Complainant arranged with Plaintiff for Plaintiff and
his family to move from Brazil to the United States to work at R. Gems. (*Id.* at
38:25-39:2). Plaintiff was "forced to leave" R. Gems when he removed the gem-
cutting machines from the store and refused to bring them back. (*Id.* at 42:1-
16). Complainant was evidently concerned that Plaintiff might work for others
if Plaintiff removed the gem-cutting machines. (*Id.* at 46:23-25). Plaintiff then
learned from an accountant in the same building as R. Gems that Complainant
had reported Plaintiff to the NYPD for allegedly stealing the gem-cutting
machines. (*Id.* at 57:6-12).

Plaintiff also testified that about a year prior to the February 2019
accusations, he witnessed Complainant and Williams speaking together at a
coffee shop. (Da Mata Dep. 88:23-89:23). Plaintiff then overheard
Complainant speaking with Complainant's wife about how Williams was an "old
school friend." (*Id.* at 90:11-23). However, after that point, Plaintiff never
witnessed any further interactions between Williams and Complainant. (*Id.* at
91:13-92:10). Williams, on the other hand, testified that prior to his
investigation of Plaintiff, he did not know Complainant and that he did not go
to high school with Complainant. (Williams Dep. 214:10-17). Complainant
likewise submitted an affidavit, attesting that he did not know Williams prior to

filing his complaint against Plaintiff, and that he did not attend high school with Williams.  (Gosling Decl., Ex. A; Def. 56.1 ¶ 9).

## B.    Procedural Background

Plaintiff initiated this case against Defendants by filing the Complaint on January 8, 2021.  (Dkt. #1 ("Compl.")).  On April 16, 2021, the City of New York filed its answer to the Complaint.  (Dkt. #8).  Following a request by the parties, the Court adjourned the initial pretrial conference in this case on July 29, 2021 (Dkt. #18), and separately entered a case management plan (Dkt. #17).  On August 25, 2021, Williams filed his answer to the Complaint.  (Dkt. #20).

On February 3, 2022, Defendants filed a letter requesting a sixty-day extension of fact discovery, as well as an adjournment of the post-fact discovery conference.  (Dkt. #24).  In this letter, Defendants argued that Plaintiff's counsel had been dilatory in responding to discovery requests and otherwise communicating with Defendants.  (*Id.*).  For example, Defendants noted that no depositions had been completed, and that Plaintiff had responded to Defendants' requests for admission more than ten days past the deadline set in Federal Rule of Civil Procedure 36.  (*Id.*).  In response to this letter, the Court held a conference on February 4, 2022, and ordered Plaintiff to respond to Defendants' letter.  (February 4, 2022 Minute Entry; Dkt. #25).  On February 7, 2022, Plaintiff filed his response letter.  (Dkt. #26).  In this letter, Plaintiff disagreed with the representations in Defendants' letter and rejected Defendants' request to amend the Complaint to conform with evidence gathered during discovery.  (*Id.*).  Plaintiff did, however, consent to an

9

extension of the fact discovery deadline.  (*Id.*).  Defendants then filed a reply letter.  (Dkt. #27).  In this letter, Defendants requested that Defendants' requests for admission be deemed admitted, as Plaintiff had failed to timely respond to them.  (*Id.*).  Further, Defendants pointed out that, even crediting Plaintiff's untimely responses to the requests for admission, there remained serious discrepancies between the allegations in the Complaint and the evidence produced in discovery.  (*Id.*).  For example, Defendants noted that Plaintiff's responses to the requests for admission contradicted Plaintiff's allegations that: (i) Plaintiff was arrested at his home; (ii) the police searched Plaintiff at his home; (iii) the police used excessive force against Plaintiff; and (iv) Plaintiff was strip-searched in connection with his arrest.  (*Id.*; *see also id.*, Ex. A (Plaintiff's untimely responses to Defendants' requests for admission)).

On February 8, 2022, the Court resolved certain of these discovery disputes.  (Dkt. #29).  The Court noted that the discovery issues in this case had been occasioned by "Plaintiff's counsel's inattention to court-ordered deadlines" as discussed at the February 4, 2022 conference before ultimately granting the parties a limited extension of fact discovery.  (*Id.*).  In this same Order, the Court granted Defendants' application that its requests for admission be deemed admitted due to Plaintiff's failure to comply with Federal Rule of Civil Procedure 36(a)(3).  (*Id.*).

On March 18, 2022, the parties filed a joint letter discussing their contemplated cross-motions for summary judgment.  (Dkt. #30).  The Court endorsed this letter and set a post-fact discovery conference for May 3, 2022.

(Dkt. #31).  The Court also ordered the parties to submit pre-motion letters prior to this conference.  (*Id.*).  On April 18, 2022, Defendants submitted a letter to the Court requesting an extension of time to submit their pre-motion letter. (Dkt. #32).  In this letter, Defendants noted that Plaintiff once again was failing to timely communicate with Defendants regarding possible dismissal of certain claims, and that an extension was necessary to permit Plaintiff to consider withdrawing these claims prior to the pre-motion conference.  (*Id.*). On April 19, 2022, the Court ordered Plaintiff to respond to Defendants' proposed stipulation to voluntarily dismiss certain claims, and extended Defendants' time to submit their pre-motion letter to April 29, 2022.  (Dkt. #33).  The Court noted that Plaintiff could respond to Defendants' forthcoming pre-motion letter in writing prior to the post-fact discovery conference, or orally at the conference.  (*Id.*).

On April 29, 2022, the Court entered the parties' stipulation of dismissal of Plaintiff's unlawful entry, unlawful strip search, excessive force, and Section 1983 municipal liability claims.  (Dkt. #36; *see also* Compl. ¶¶ 84-87, 157-162).  On April 29, 2022, Defendants filed their pre-motion letter contemplating a motion for summary judgment as to all of Plaintiff's remaining claims.  (Dkt. #37).  On May 3, 2022, the Court held the post-fact discovery and pre-motion conference in this case.  (May 3, 2022 Minute Entry).  At that conference, the Court set a briefing schedule for Defendants' contemplated motion for summary judgment.  (*Id.*).  On May 26, 2022, Defendants submitted a letter requesting an extension of the summary judgment briefing schedule and

11

proposing a new schedule (Dkt. #38), which schedule the Court endorsed (Dkt. #39).  In line with this amended schedule, Defendants submitted their motion for summary judgment and supporting papers on July 1, 2022.  (Dkt. #42-45).

On July 22, 2022, Plaintiff requested an extension of time to file his opposition papers.  (Dkt. #46).  The Court granted Plaintiff a one-month extension that same day.  (Dkt. #47).  On September 2, 2022, four days prior to his extended deadline, Plaintiff again requested an extension.  (Dkt. #51).  The Court again granted Plaintiff a two-week extension.  (Dkt. #52).  On September 20, 2022, the day Plaintiff's opposition was due, Plaintiff again requested an extension of 10 days, citing staffing concerns and a need to further investigate certain claims.  (Dkt. #53).  The Court granted Plaintiff a limited extension to September 23, 2022, and noted that it would not grant any further extensions.  (Dkt. #54).  On September 23, 2022, just one hour prior to his filing deadline, Plaintiff again requested an extension.  (Dkt. #56).  The Court denied this request, and noted that the request further reflected Plaintiff's counsel's "patent disregard for Court-ordered deadlines."  (Dkt. #57). The Court extensively detailed Plaintiff's dilatory conduct throughout the case, and noted that it would consider Defendants' motion for summary judgment to be unopposed.  (*Id.*).  In this Order, the Court also stated that it would not require further submissions from Defendants.  (*Id.*).

## DISCUSSION

### A.    Unopposed Motions for Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[6]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)

---

[6]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. See Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

(internal citations, quotation marks, and emphasis omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

A party's failure to oppose a summary judgment motion does not relieve a district court of the onus to decide whether the movant has met this standard.  *See Vt. Teddy Bear Co.*, 373 F.3d at 242; *accord Jackson* v. *Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) ("Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed.").  In such case, "the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed."  *Slep-Tone Entm't Corp.* v. *Golf 600 Inc.*, 193 F. Supp. 3d 292, 295 (S.D.N.Y. 2016) (quoting *Jackson*, 766 F.3d at 194).  Therefore, "the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion."  *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo* v. *City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

## B.   Analysis

As noted above, Plaintiff voluntarily dismissed his unlawful entry, unlawful strip search, excessive force, and Section 1983 municipal liability

claims.  (Dkt. #36).[7]  The claims that remain in this case include (i) false arrest and false imprisonment under New York State law and 42 U.S.C. § 1983; (ii) assault and battery under New York State law; (iii) malicious prosecution under New York State law and 42 U.S.C. § 1983; (iv) failure to intervene under New York State law and 42 U.S.C. § 1983; (v) malicious abuse of process under New York State law and 42 U.S.C. § 1983; (vi) deprivation of rights and denial of equal protection under New York State law and 42 U.S.C. §§ 1981 and 1983; (vii) conspiracy to interfere with civil rights and failure to prevent conspiracy under 42 U.S.C. §§ 1983, 1985, and 1986; and (viii) negligent hiring, retention, and supervision under New York State law.  (Compl. ¶¶ 66-83, 88-156).

### 1. The Court Grants Summary Judgment as to Plaintiff's False Arrest and False Imprisonment Claims

#### a. Applicable Law

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under Section 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of

---

[7]     On this point, it bears noting that many of the factual allegations in the Complaint offered in support of the remaining claims are wholly unsupported by the record before the Court.  For example, the Complaint alleges that NYPD officers, including Williams, illegally searched Plaintiff's home and physically restrained Plaintiff in his home. (Compl. ¶¶ 21-23).  However, as is clear from the Court's recitation of the undisputed facts in this case, NYPD officers never visited Plaintiff's home, and Plaintiff voluntarily surrendered to the NYPD at Williams's precinct.  Plaintiff's allegations that he was subjected to a strip search and cavity search are likewise entirely unsupported.  (*Id.* ¶¶ 32-33).

[his] federal statutory rights, or [his] constitutional rights or privileges." *Annis* v. *Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

"A [Section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Shaheed* v. *City of New York*, 287 F. Supp. 3d 438, 448 (S.D.N.Y. 2018) (quoting *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "[U]nder New York law, a plaintiff bringing a claim for false arrest or false imprisonment must show that '[i] the defendant intended to confine [the plaintiff], [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement and [iv] the confinement was not otherwise privileged.'" *Shaheed*, 287 F. Supp. 3d at 448 (quoting *Singer* v. *Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). Among the circumstances where confinement is privileged is a lawful arrest effectuated on the basis of probable cause. *Shaheed*, 287 F. Supp. 3d at 448. Accordingly, "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest" or false imprisonment, "whether that action is brought under state law or under [Section] 1983." *Jenkins* v. *City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852) (internal quotation marks omitted).

It is well established that "[a]n officer has probable cause to arrest when in possession of facts sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense." *Ricciuti* v. *N.Y.C.*

16

*Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).  Indeed, "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119.  And "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128.  There is no "duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." *Jocks* v. *Tavernier*, 316 F.3d 128, 135-36 (2d Cir. 2003). "When determining whether probable cause exists[,] courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Shaheed*, 287 F. Supp. 3d at 448 (quoting *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted)). "On summary judgment, the existence of probable cause or arguable probable cause may be determined as a matter of law where 'there is no dispute as to the pertinent events and the knowledge of the officers.'" *Id.* at 449 (quoting *Weyant*, 101 F.3d at 852).

Even absent probable cause to arrest the plaintiff, an officer will be entitled to qualified immunity if "arguable probable cause" existed — *i.e.*, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that

17

probable cause existed in the light of well[-]established law." *Cerrone* v. *Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (internal quotation marks and citation omitted); *see also Shaheed*, 287 F. Supp. 3d at 449.  The doctrine of qualified immunity provides a complete defense where "either [i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Golino* v. *City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

### b.     Probable Cause Existed for Plaintiff's Arrest

According to his arrest report, Detective Williams arrested Plaintiff for grand larceny.  (Gosling Decl., Ex. I).  Under New York Penal Law Section 155.30, "[a] person is guilty of grand larceny in the fourth degree when he steals property and when … [t]he value of the property exceeds one thousand dollars[.]"  N.Y. Penal Law § 155.30.  In light of the penal law, the Court considers the facts available to Williams at the time of Plaintiff's arrest. Complainant made his allegations against Plaintiff to non-party Officer Michael Lennon.  (Def. 56.1 ¶ 1; Gosling Decl., Ex. B).[8]  In relevant part, Complainant alleged that Plaintiff stole the gem-cutting machines from R. Gems, and that the machines were valued at $7,000.  (Def. 56.1 ¶ 1; Gosling Decl., Ex. B).

---

[8]     As a general matter, under both federal and state law, police officers are entitled to rely on information relayed to them from fellow officers in making a probable cause determination.  *See, e.g.*, *United States* v. *Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."); *People* v. *Rosario*, 78 N.Y.2d 583, 588 (1991) (describing the analogous "fellow officer" rule under state law).

Following this initial complaint, non-party Detective Donovan followed up with Complainant, and memorialized the conversation in a DD5. (Def. 56.1 ¶ 3). The relevant DD5 corroborates the initial complaint. (Gosling Decl., Ex. D). Williams then took control over the investigation and contacted Complainant. (Williams Dep. 45:24-46:12, 49:16-50:2).[9] As part of his investigation, Williams traveled to R. Gems and collected and reviewed video footage of Plaintiff disassembling the component parts of at least one machine and placing them into plastic bags. (Def. 56.1 ¶¶ 5-6; Gosling Decl., Ex. E; *see also* Williams Dep. 59:10-18, 61:5-22). Although this footage spanned fifteen minutes, Complainant appears for only four seconds, during which time Plaintiff is not actively disassembling the machine. (Gosling Decl., Ex. F). Finally, Plaintiff, accompanied by his attorney, voluntarily surrendered to the NYPD at Williams's precinct.

On these facts, Williams plainly had probable cause to arrest Plaintiff for grand larceny. As a general matter, Williams was entitled to rely on Complainant's allegations that (i) the machines were property belonging to R. Gems; (ii) Plaintiff wrongly removed the machines; and (iii) the machines were worth over $1,000. And those allegations provided Williams with probable cause to arrest Plaintiff. *See, e.g.*, *Prowisor* v. *Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 172 (S.D.N.Y. 2006) (finding officer had probable cause for arrest where two security guards alleged that the plaintiff concealed earmuffs for which he

---

[9]     As noted in the Court's recitation of the facts, this call was not memorialized in a DD5. Even if the Court were to disregard the fact that this call occurred, its analysis would be the same.

did not pay), *aff'd*, 232 F. App'x 26 (2d Cir. 2007) (summary order) ("It is undisputed that Officer Roth arrested [plaintiff] for petit larceny after speaking to one of [the store's] security guards … who claimed to have seen [plaintiff] conceal a pair of earmuffs in his jacket pocket.  Because Officer Roth had no reason to doubt [the security guard's] veracity, the information provided by [the guard] furnished Officer Roth with probable cause to make the arrest."); *Curley* v. *Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity." (internal citations omitted)); *Baldeo* v. *Keiser-O'Neill*, No. 17 Civ. 5284 (ERK) (RML), 2018 WL 3733942, at *3 (E.D.N.Y. Aug. 6, 2018) (finding officer had probable cause for variety of property-related crimes where officer had non-anonymous "victim-complaint along with significant corroborating evidence"); *Ong* v. *Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12 Civ. 974 (KMK), 2017 WL 4326540, at *10 (S.D.N.Y. Sept. 28, 2017) ("[P]robable cause exists when a law enforcement officer 'receive[s] … information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" (quoting *Panetta*, 460 F.3d at 395)); *cf. Diop* v. *City of New York*, 50 F. Supp. 3d 411, 424 (S.D.N.Y. 2014) (finding, in granting officer qualified immunity, that a "reasonably competent police officer in [officer's] position could have reasonably believed that there was probable cause to prosecute [plaintiff] for possession of stolen property … based solely on the robbery victim's identification of the purse recovered from [plaintiff's] vehicle as

the purse that had been stolen from her").  Further, multiple officers took corroborating statements from Complainant, and Williams reviewed video footage that did not contradict Complainant's allegations.

Williams was not obligated to do more.  To be clear, the Court harbors concerns that Complainant may have fabricated the complaint against Plaintiff in pursuit of his own ulterior motives.  For example, Plaintiff's deposition testimony suggests that his living and work conditions may have been exploitative, and that Complainant may have threatened Plaintiff with criminal allegations in order to keep Plaintiff working at R. Gems.  But the law in this area is concerned with the knowledge available to the police at the time of an arrest, and not with all facts that could have been known.  *See, e.g.*, *Grimm* v. *Krupinsky*, No. 04-2913-cv, 2005 WL 1586978, at *2 (2d Cir. July 7, 2005) (summary order) ("Further investigation might have undermined this latter claim, but no further investigation was required and in this inquiry we rely solely on the information then available to" the officer.); *Curley*, 268 F.3d at 70 ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him."); *Stokes* v. *City of New York*, No. 05 Civ. 7 (JFB) (MDG), 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest." (citation and alteration omitted)).  More to the point, that probable cause existed does not mean

something untoward did not occur.  It simply means that Defendants' actions are protected because of the facts available to them at the time of Plaintiff's arrest.  Indeed, if Plaintiff's sworn testimony is true — which the Court is obligated to believe — he may have a claim against a party not before this Court.

Although Defendants' motion for summary judgment is unopposed, the Court pauses for a moment to address wrinkles in the factual record that Plaintiff may have highlighted.  *First*, it appears that Williams was aware that the initial complaint listed Complainant's and Plaintiff's addresses as the same. (*See, e.g.*, Williams Dep. 124:13-24).  *Second*, there remains a factual dispute regarding whether Williams and Complainant knew each other prior to Complainant's allegations and Plaintiff's arrest.  Defendants submit that Williams and Complainant did not know each other prior to the relevant events, and that Williams's first time interacting with Complainant was when Williams visited R. Gems to retrieve the video footage.  (Williams Dep. 214:10-17; Gosling Decl., Ex. A; Def. 56.1 ¶ 9).  At Plaintiff's deposition, however, Plaintiff testified that he once witnessed Complainant and Williams speaking at a coffee shop, and then overheard a conversation between Complainant and Complainant's wife in which Complainant stated that Williams was an "old school friend."  (Da Mata Dep. 88:23-90:22).

As discussed, officers are generally entitled to rely on a putative victim's allegations.  That said, "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable

cause." *Manganiello* v. *City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal citation omitted).  Although information furnished to the police by a person who claims to be a victim of a crime generally "suffices to establish probable cause," *Oliveira* v. *Mayer*, 23 F.3d 642, 647 (2d Cir. 1994), this presumption of victim reliability only survives in the "absen[ce] [of] circumstances that raise doubts as to the victim's veracity," *Singer*, 63 F.3d at 119.  For example, police must consider relationships between a putative victim and accused that could "give[] rise to a motive for a false accusation." *Mistretta* v. *Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).

Although Williams appears to have been aware that Plaintiff and Complainant had the same address, there is no evidence suggesting that Williams knew of any suspect motivations Complainant may have harbored in making the complaint.  *See, e.g.*, *Sankar* v. *City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012) (finding arresting officers were required to corroborate complaining victim's account, where officers were "aware of the contentious relationship that existed" between plaintiff and putative victim); *Powar* v. *City of New York*, No. 14 Civ. 4053 (KAM) (RER), 2016 WL 8711092, at *11 (E.D.N.Y. Sept. 30, 2016) (finding probable cause was not undermined by prior relationship between putative victim and plaintiff, because "there is no evidence that [officer] was aware of other details about the length or nature of plaintiff's prior interactions" with the putative victim).  True, Williams could have investigated further, and may have uncovered facts suggesting indicia of impropriety regarding the allegations.  But there is simply nothing in the record

suggesting that Williams knew of some problematic dynamic between Plaintiff and Complainant, beyond the mere fact that the complaint lists their addresses as the same.  Thus, Williams was entitled to rely on Complainant's statements, which were consistent across his numerous conversations with Williams and other officers.

Even crediting Plaintiff's testimony that Williams and Complainant knew each other in some capacity (*see, e.g.*, Da Mata Dep. 91:13-92:10 (Plaintiff's testimony that beyond witnessing one limited interaction, Plaintiff never saw Williams and Complainant again interact)), the Court's conclusion that probable cause existed remains.  On this record, the Court cannot make the considerable inferential leap required to conclude that a single conversation between Williams and Complainant one year prior to the relevant events should have given Williams reason to doubt the veracity of the initial complaint or otherwise vitiated probable cause.  Here, the Court is guided by the decision in *Rae* v. *County of Suffolk*, 693 F. Supp. 2d 217 (E.D.N.Y. 2010), in which the court found that the fact that the investigating officers and complainant were colleagues did not vitiate probable cause.  In so doing, the court rejected the plaintiff's argument that

> simply ... because [investigating officers] and [fellow officer/complainant] knew one another as a result of being colleagues at the SCPD, the Court should infer that the investigation conducted by [the investigating officers] failed to comport with what a reasonable person would have undertaken....  Because the facts, when viewed objectively, show that the SCPD had sufficient evidence to support a finding of probable cause, this argument must be rejected.

24

*Id.* at 225; *see also id.* ("While, in hindsight, it may be that [investigating officer] could have asked additional questions, or conducted a fuller investigation, the role of the court is not to overly scrutinize the decisions from its vantage in chambers, long after those decisions were made, but to determine whether the officers acted reasonably and in compliance with what the law requires based on what they knew at the time."). Thus, the (disputed) fact that Complainant and Williams may have some distant friendship does not negate the probable cause that any other officer would have had to arrest Plaintiff based on the available facts.

In any event, Williams *did* investigate further, and did not solely rely on Complainant's word. *See Mistretta*, 5 F. Supp. 2d at 134 (finding officer had probable cause in case where spouse complained to police of alleged crimes committed by other spouse in midst of divorce proceeding, where officer engaged in further investigation to corroborate complaint); *Nansaram* v. *City of New York*, No. 12 Civ. 5038 (NGG) (RLM), 2015 WL 5518270, at *3 (E.D.N.Y. Sept. 17, 2015) (finding officer had probable cause despite knowledge of domestic dispute between putative victim and plaintiff because officer appropriately conducted "follow-up debriefing" and further investigation); *Brodie* v. *Fuhrman*, No. 07 Civ. 4212 (DGT), 2010 WL 1189347, at *6 (E.D.N.Y. Mar. 29, 2010) ("[E]ven if a prior relationship exists, when a 'victim precisely identifies the alleged perpetrator of a crime and there is independent corroborative evidence to support at least some of the victim's assertions, a person of reasonable caution is warranted in believing that an offense has been

25

committed by the alleged perpetrator.'" (quoting *Bullard* v. *City of New York*, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003))).  Williams reviewed the video footage of Plaintiff, which footage was consistent with Complainant's allegations that Plaintiff removed gem-cutting machines belonging to R. Gems from the jewelry store.  In the face of the putative victim consistently and repeatedly claiming ownership of the machines, the common-sense supposition that "any items that we[re] in the location [were in] the possession of the store[,]" and the absence of any facts suggesting that Plaintiff owned the machines, this video evidence sufficiently corroborates Complainant's account, even if there were grounds to question the veracity of Complainant's statements.  (Def. 56.1 ¶¶ 14-16).

Because the undisputed facts show that Williams had probable cause to arrest Plaintiff, Plaintiff's false arrest and false imprisonment claims under both state and federal law fail.  Further, because Williams plainly had probable cause to arrest Plaintiff, "*a fortiori*, 'arguable probable cause'" existed for the arrest, and Williams would otherwise also be entitled to qualified immunity. *Richardson* v. *City of New York*, No. 17 Civ. 8622 (PAE) (RWL), 2020 WL 5801476, at *5 (S.D.N.Y. Sept. 29, 2020), *aff'd*, 850 F. App'x 805 (2d Cir. 2021) (summary order).

### 2. The Court Grants Summary Judgment as to Plaintiff's Claims of Malicious Prosecution Under Federal and State Law

#### a. Applicable Law

When "a plaintiff presents a claim of malicious prosecution under [Section] 1983, the court must engage in two inquiries: whether the defendant's

conduct was tortious; and whether the plaintiff's injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment." *Singer*, 63 F.3d at 116. Thus "[t]o state a Section 1983 claim for malicious prosecution, the plaintiff must allege the four elements of malicious prosecution under New York state law and a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Manbeck* v. *Micka*, 640 F. Supp. 2d 351, 369 (S.D.N.Y. 2009) (quoting *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). Where a plaintiff "[can]not establish one of the elements of his malicious prosecution claim" under state law, a district court may dismiss the Section 1983 claim without deciding whether the alleged malicious prosecution amounted to a violation of the plaintiff's constitutional rights. *Singer*, 63 F.3d at 118. Accordingly, the Court may resolve its inquiry into both Plaintiff's Section 1983 and state law malicious prosecution claims by examining whether there are facts sufficient to go to a jury on the elements of common law malicious prosecution.

Under New York law, "[t]o prevail on a claim of malicious prosecution, four elements must be shown: [i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice and, [iv] the matter terminated in plaintiff's favor." *Ricciuti*, 124 F.3d at 130. Absent intervening circumstances, probable cause sufficient to justify an arrest is also treated by courts as probable cause sufficient to justify a prosecution. *See, e.g.*, *Shaheed*, 287 F. Supp. 3d at 452 ("[W]hen a court finds there was probable cause for an arrest,

and in the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie." (quoting *Johnson* v. *City of Mount Vernon*, No. 10 Civ. 7006 (VB), 2012 WL 4466618, at *5 (S.D.N.Y. Sept. 18, 2012)) (collecting cases).

### b.   No Intervening Circumstances Negated Probable Cause[10]

According to the materials submitted by Defendants, Plaintiff was arrested on February 27, 2019, on a charge of grand larceny, a Class E felony (Gosling Decl., Ex. I), and was charged in criminal court later that day with petit larceny, a Class A misdemeanor (*id.*, Ex. J).[11]  As discussed above, probable cause existed at the time of Plaintiff's arrest for a charge of grand larceny; of necessity, therefore, probable cause existed for the lesser offense of petit larceny.  Thus, the Court's analysis of Plaintiff's malicious prosecution claims under both federal and state law focuses on whether intervening facts and circumstances discovered after Plaintiff's arrest undermined the probable

---

[10]    Defendants additionally argue that Williams did not "initiate" Plaintiff's prosecution. However, Williams signed the criminal court complaint.  *See, e.g.*, *McKenzie* v. *City of New York*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *14 (S.D.N.Y. July 22, 2019) ("Because [officer] signed the initial complaint on which the District Attorney brought charges and on which [plaintiff] was arraigned and held in custody, however, a jury could find those actions sufficient to establish that [officer] initiated criminal proceedings against [plaintiff] on the basis of the allegations in the [superseding] criminal complaint." (internal citation omitted)); *Mitchell* v. *Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) ("[P]laintiffs have demonstrated that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints.").

[11]    Under New York law, "[a] person is guilty of petit larceny when he steals property."  N.Y. Penal Law § 155.25.

cause that existed at the time of his arrest. *Johnson*, 2012 WL 4466618, at *5 (finding malicious prosecution claim failed after court found probable cause existed for arrest, and no new facts or evidence undermined probable cause prior to prosecution). On the Court's review of the record, no intervening facts undermined probable cause for Plaintiff's prosecution on a charge of petit larceny, and thus Plaintiff's malicious prosecution claims under both state and federal law fail.

As noted, Plaintiff, accompanied by his attorney, peacefully surrendered to Williams at the NYPD precinct, and was then arrested. (Williams Dep. 90:9-15; Da Mata Dep. 67:2-19). Thereafter, Plaintiff's lawyer instructed Williams to refrain from questioning Plaintiff, but failed even to suggest to law enforcement that the allegations against Plaintiff were based on incorrect information. (Williams Dep. 105:19-106:10, 106:25-107:5). Williams signed the criminal court complaint against Plaintiff charging him with petit larceny on the same day Plaintiff was arrested — February 27, 2019. (Gosling Decl., Ex. J; Def. 56.1 ¶¶ 17-18). At no point prior to Williams's signing of the complaint nor immediately after did Plaintiff explain that the charges rested on mistaken facts, including that Plaintiff was the owner of the gem-cutting machines. (Williams Dep. 107:6-22; Da Mata Dep. 86:2-87:1). Indeed, Plaintiff had no documents substantiating his ownership of the machines, and did not represent orally or otherwise that he owned the machines. (Da Mata Dep. 44:24-45:1, 84:2-21). Instead, Plaintiff presented such evidence for the first time as part of his criminal court proceedings in May 2019, when he

submitted an affidavit from a friend averring that Plaintiff had brought the machines from Brazil to the United States.  (Def. 56.1 ¶ 19; Da Mata Dep. 86:13-21; Gosling Decl., Ex. K (May 3, 2019 affidavit)).  Thereafter, the court dismissed the case against Plaintiff on May 23, 2019.  (Def. 56.1 ¶ 20; Gosling Decl., Ex. L at 3).

As such, at no point prior to May 2019 did Williams or the District Attorney's Office have any evidence undermining probable cause for the larceny offense with which Plaintiff was charged.  As a general matter, Defendants "were under no obligation to attempt to exonerate plaintiff or to uncover exculpatory evidence."  *Rodriguez* v. *City of New York*, No. 08 Civ. 4173 (RRM) (RLM), 2012 WL 1059415, at *11 (E.D.N.Y. Mar. 28, 2012).  Because Defendants "did not learn of any intervening facts between arrest and initiation of prosecution to undermine that probable cause, claims of malicious prosecution cannot survive."  *Powell* v. *Murphy*, 593 F. App'x 25, 28 (2d Cir. 2014) (summary order) (citing *Manganiello*, 612 F.3d at 161-62; *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)); *see also Medina* v. *City of New York*, No. 20 Civ. 797 (VEC), 2021 WL 1700323, at *4 (S.D.N.Y. Apr. 29, 2021) ("Plaintiff has failed to allege that any additional facts came to light between her arrest and the initiation of prosecution that negated probable cause; [p]laintiff did not produce the notarized document indicating that the incorrect VIN on the registration was the dealership's error until almost three months *after* her arrest and the initiation of prosecution.").

### c.     No Facts Suggest Williams Acted with Malice

Even if the Court were to find that intervening facts had come to light that undermined probable cause for Plaintiff's prosecution, there is no evidence that Williams or others acted with malice.  In the context of a malicious prosecution claim, "malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'"  *Lowth*, 82 F.3d at 573 (quoting *Nardelli* v. *Stamberg*, 44 N.Y.2d 500, 502-03 (1978)).  Having reviewed the entirety of Plaintiff's and Williams's depositions, as well as the other evidence Defendants submitted, there is simply no indication that Williams initiated the prosecution of Plaintiff because of personal animus or some other malevolent desire.  Thus, Plaintiff's malicious prosecution claims under both state and federal law fail for this independent reason.  *See, e.g.*, *Guillen* v. *City of New York*, No. 19 Civ. 5655 (JPC) (OTW), 2022 WL 4072925, at *11 (S.D.N.Y. Sept. 2, 2022) ("There is no evidence that the [o]fficer [d]efendants had any personal animus toward [p]laintiff or that they were motivated by something other than a desire to see the ends of justice served." (internal quotation marks and citation omitted)); *Keith* v. *City of New York*, No. 11 Civ. 3577 (KPF), 2014 WL 6750211, at *19 (S.D.N.Y. Dec. 1, 2014) ("Plaintiff does not point to — and, indeed, the record is devoid of — any facts indicating that [d]efendants acted with the requisite malice to support a malicious prosecution claim."), *aff'd*, 641 F. App'x 63 (2d Cir. 2016) (summary order); *see also Harry* v. *City of New York*, No. 20 Civ.

5951 (GBD), 2022 WL 17718339, at *4 (S.D.N.Y. Dec. 15, 2022) ("Because this Court finds that probable cause did exist, [p]laintiff's failure to furnish any evidence of malice is independent grounds for granting summary judgment to [d]efendants[.]").[12]

### 3. The Court Grants Summary Judgment as to Plaintiff's Claims of Malicious Abuse of Process Under Federal and State Law

As with Plaintiff's other claims brought under Section 1983, courts look to state law for the elements of a claim for malicious abuse of process.  *Cook* v. *Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).  Under New York law, a plaintiff bringing a claim for malicious abuse of process must allege that the defendant "[i] employ[ed] regularly issued legal process to compel performance or forbearance of some act [ii] with intent to do harm without excuse or justification, and [iii] in order to obtain a collateral objective that is outside the legitimate ends of the process."  *Savino* v. *City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook*, 41 F.3d at 80).  "The malicious abuse of criminal process may give rise to a Section 1983 claim, because the resulting deprivation of liberty is 'by definition a denial of procedural due process.'" *Pinter* v. *City of New York*, 976 F. Supp. 2d 539, 567 (S.D.N.Y. 2013) (quoting *Cook*, 41 F.3d at 80) (emphasis omitted).

---

[12]     The Court's finding that arguable probable cause existed for Plaintiff's arrest, coupled with the absence of any evidence that "dissipated" that arguable probable cause before his prosecution, similarly requires a finding of qualified immunity as to Plaintiff's malicious prosecution claims.  See *Betts* v. *Shearman*, 751 F.3d 78, 82-83 (2d Cir. 2014).

Unlike malicious prosecution, "[t]he gist of the tort of abuse of process is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish." *Trisechmann* v. *Rotblut*, No. 94 Civ. 2485 (WK), 1995 WL 168817, at *2 (S.D.N.Y. Apr. 7, 1995) (quoting *Weiss* v. *Hunna*, 312 F.2d 711, 717 (2d Cir. 1963)). "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77; *see also De Santis* v. *City of New York*, No. 10 Civ. 3508 (NRB), 2011 WL 4005331, at *8 (S.D.N.Y. Aug. 29, 2011) ("[T]he requirement of a collateral objective is not met merely by showing a malicious motive; there must be an improper purpose for the use of process, *i.e.* something other than the purpose for which the law created it."). Examples of the types of collateral objectives covered by the tort of malicious abuse of process include the infliction of economic harm, extortion, blackmail, and retribution. *Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010) (citation omitted).

There is no evidence suggesting that Defendants pursued some collateral objective here. *See, e.g.*, *Deanda* v. *Hicks*, 137 F. Supp. 3d 543, 576 (S.D.N.Y. 2015) ("Plaintiff has not alleged facts or presented evidence to create a genuine issue of material fact that suggests there was any reason for her arrest, the felony complaint, or the incident report other than her prosecution and

possible conviction.") (collecting cases).  This result would be the same even if the Court credited Plaintiff's testimony that Williams and Complainant may have shared some distant friendship.  *See, e.g., O'Brien* v. *City of Yonkers*, No. 07 Civ. 3974 (KMK) (LMS), 2013 WL 1234966, at *18 (S.D.N.Y. Mar. 22, 2013) (rejecting abuse of process claim premised on theory that putative victim's uncle, an NYPD officer, "pressured or influenced" officer-defendants to arrest and prosecute plaintiff because "an augmented motive to arrest and prosecute is not an improper collateral objective" (internal quotation marks omitted)); *see also id.* (discussing, in context of collateral objective inquiry, analogous malicious prosecution cases, including cases rejecting idea that victim's friendship with officers alone constitutes bad faith for prosecution).

### 4.   The Court Grants Summary Judgment as to Plaintiff's Equal Protection Claims Under State and Federal Law[13]

The Court understands Plaintiff's equal protection claims under state and federal law to be predicated on theories of discriminatory application of facially neutral laws or policies[14] and selective enforcement.  (*See* Compl.

---

[13]   Although Plaintiff alleges equal protection violations under both Sections 1981 and 1983, Section 1981 "does not provide a separate private right of action against state actors."  *Duplan* v. *City of New York*, 888 F.3d 612, 621 (2d Cir. 2018).

[14]   Discriminatory application of facially neutral laws and policies is a separately cognizable equal protection theory.  *Pyke* v. *Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) ("We now clarify — a plaintiff who … alleges an express racial classification, or alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.").  Defendants appear only to directly address Plaintiff's selective enforcement theory, but nonetheless argue that Plaintiff cannot show "discriminatory animus."  Because it is necessary to show intentional discrimination under *Pyke*, the Court also considers whether Plaintiff's claim that Defendants applied facially neutral laws in a discriminatory fashion survives summary judgment.

¶¶ 126-143; *id.* ¶ 139 ("Defendants' selective treatment of Plaintiff was based on impermissible considerations, such as race, religion, intent to inhibit or punish Plaintiff's exertion of his [c]onstitutional rights, or malicious or bad faith intent to injure Plaintiff.")).[15]   The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1.[16]   At its core, the Equal Protection Clause prohibits the disparate treatment of similarly situated individuals.   *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   "To establish a violation of the Equal Protection Clause based on selective enforcement, a plaintiff must ordinarily show the following: [i] [that] the person, compared with others similarly situated, was selectively treated; and [ii] that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."   *Freedom Holdings, Inc.* v. *Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004)

---

[15]     As noted throughout this Opinion, several of the allegations in the Complaint are wholly unsupported by the factual record or concern claims that have already been dismissed. For example, the Complaint states that "Defendant Williams possessed no valid reason to search and to arrest Plaintiff, which gives rise to the strong inference that the unlawful acts … against Plaintiff were discriminatorily motivated and enacted upon." (Compl. ¶ 56).   Plaintiff is no longer pursuing claims premised on illegal searches or excessive force, and the Court has found that probable cause existed for Plaintiff's arrest.   Plaintiff likewise dismissed his municipal liability claim under Section 1983; in any event, there is no evidence to suggest that there is a viable claim premised on the City's policies.

[16]     "[T]he Equal Protection Clause in the New York State Constitution is 'no broader in coverage than its Federal counterpart.'"   *MTA Bus Non-Union Emps. Rank & File Comm. ex rel. Simone* v. *Metro. Transp. Auth.*, 899 F. Supp. 2d 256, 264 (S.D.N.Y. 2012) (quoting *N.Y.C. Managerial Employees Assoc.* v. *Dinkins*, 807 F. Supp. 958, 966 n.4 (S.D.N.Y. 1992)).

(internal citation omitted).  "The elements of a selective prosecution claim are the same, except plaintiff must prove under the first prong that others similarly situated have not generally been prosecuted for the same type of conduct, and that plaintiff was singled out for prosecution." *Anderson* v. *City of New York*, 817 F. Supp. 2d 77, 94 (E.D.N.Y. 2011) (citing *United States* v. *White*, 972 F.2d 16, 19-20 (2d Cir. 1992)).

Separately, a plaintiff may make out an equal protection violation without reference to similarly situated comparators by showing "[i] a law that makes classifications specifically based on a protected class, including race; [ii] 'a facially neutral law or policy that has been applied in a discriminatory manner'; or [iii] a facially neutral policy … 'has an adverse effect and was motivated by discriminatory animus.'" *Walsh* v. *City of New York*, No. 19 Civ. 9238 (AT), 2021 WL 1226585, at *12 (S.D.N.Y. Mar. 31, 2021) (quoting *Pyke* v. *Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) (internal quotation marks and alteration omitted)).

As with other of his claims, there is no evidence to substantiate Plaintiff's equal protection claims under either theory.  *First*, as relevant to Plaintiff's selective enforcement or prosecution claim, there is no evidence currently before the Court establishing similarly situated individuals against whom to compare Plaintiff.  This alone is fatal to Plaintiff's selective enforcement theory. *See, e.g.*, *Pinter* v. *City of New York*, 976 F. Supp. 2d 539, 566 (S.D.N.Y. 2013) ("[Plaintiff] has provided no comparative evidence to support the conclusion that the NYPD's enforcement activity … constituted intentional discrimination

against gays."). *Second*, there is no evidence suggesting that Williams's or any other officer's actions were motivated by any discrimination on the basis of a protected characteristic (*e.g.*, race, sex, national origin, religion, or ethnicity), which absence is fatal to both the selective enforcement and discriminatory application of facially neutral laws theories. *See, e.g.*, *Lopez* v. *City of New York*, 186 F. Supp. 3d 304, 314 (S.D.N.Y. 2016) (dismissing both selective enforcement claims and intentional discrimination claims because "the absence of evidence of similarly-situated persons treated differently or of plaintiff's gender expression motivating the officers' conduct precludes injunctive relief"); *Bradshaw* v. *City of New York*, No. 17 Civ. 1199 (AJP), 2017 WL 6060781, at *14 (S.D.N.Y. Dec. 7, 2017) ("[Plaintiff's] observation that [officer defendant] acts 'more immediately' for Hispanic prisoners is entirely vague, and [plaintiff] can only speculate that [officer defendant] was racially motivated because he is Hispanic and [plaintiff] is black.  These conclusory allegations do not support an Equal Protection claim."), *aff'd sub nom. Bradshaw* v. *Hernandez*, 788 F. App'x 756 (2d Cir. 2019) (summary order); *Williams* v. *Calderoni*, No. 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) ("[I]t is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened *because* the person is a member of that racial group."), *aff'd sub nom. Williams* v. *Schwartz*, 529 F. App'x 89 (2d Cir. 2013) (summary order).  Accordingly, Plaintiff's equal protections claims under both state and federal law fail.

5.   **The Court Grants Summary Judgment as to Plaintiff's Failure to Intervene Claims Under Federal and State Law**[17]

"A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill* v. *Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (citations omitted).  An officer may be held liable for preventable harm caused by the actions of other officers, if "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene." *Jean-Laurent* v. *Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citations omitted).

The Court concludes that Defendants are entitled to summary judgment on Plaintiff's failure to intervene claims for two reasons.  To begin, Williams is the only individual Defendant in this case, beyond the Doe Defendants.  *See, e.g.*, *Case* v. *City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation." (internal quotation marks and citation omitted)).  True, a plaintiff may plead alternative theories of liability, such that a failure to intervene claim and a claim alleging an underlying constitutional violation may proceed against a single defendant even at the summary judgment stage.  *See, e.g.*, *Polanco* v.

---

[17]   As with many of Plaintiff's other claims, failure to intervene is analyzed in the same manner under both state and federal law.  *See, e.g.*, *Marshall* v. *Port Auth. of N.Y. & N.J.*, No. 19 Civ. 2168 (WHP), 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020).

*City of New York*, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *9 (S.D.N.Y. Mar. 28, 2018) (collecting cases).  However, the Complaint here does not allege a failure to intervene on the part of Williams, but instead on the part of "[t]hose Defendants that were present but did not actively participate" in the alleged unlawful conduct.  (Compl. ¶ 109).  And, as previously noted, Plaintiff cannot maintain any claims against the Doe Defendants, because "[e]ven after discovery, plaintiff has failed to identify the [Doe] defendants" and as such "the complaint against them must be dismissed."  *Keesh* v. *Artuz*, No. 97 Civ. 8417 (AKH), 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) (citing *Valentin* v. *Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997)), *aff'd sub nom. Allah* v. *Michael*, 506 F. App'x 49 (2d Cir. 2012) (summary order).

More fundamentally, "[i]f the Court determines that the officer's conduct did not violate a constitutional right … the [failure to intervene] analysis ends." *Feinberg* v. *City of New York*, No. 99 Civ. 12127 (RCC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004); *see also, e.g.*, *Usavage* v. *Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) ("Where the record does not disclose an underlying excessive force violation, and does not suggest that an officer who observed the disputed incident could have been aware of the use of excessive force, summary judgment on a duty to intercede claim is appropriate.").  As the Court has discussed, there are no underlying violations upon which Plaintiff could bring a failure to intervene claim.  This would be true even if the Court solely found that Williams was entitled to qualified immunity.  *See, e.g.*, *Williams* v. *City of New York*, No. 14 Civ. 7158 (JPO), 2016

WL 3194369, at *7 (S.D.N.Y. June 7, 2016) ("Having determined that there was at least arguable probable cause to arrest [plaintiff] — in other words, that 'a reasonable police officer in the same circumstances and possessing the same knowledge as [defendants] *could* have reasonably believed that probable cause existed' — it cannot be said that [d]efendants' failure to intervene was objectively unreasonable[.]'" (internal citations omitted)).

### 6. The Court Grants Summary Judgment as to Plaintiff's Conspiracy Claims Under 42 U.S.C. §§ 1983, 1985, and 1986

To state a claim of conspiracy under 42 U.S.C. § 1983, a plaintiff must show "[i] an agreement between two or more state actors or between a state actor and a private entity; [ii] to act in concert to inflict an unconstitutional injury; and [iii] an overt act done in furtherance of that goal causing damages." *Pangburn* v. *Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted). "[A]bsent an underlying constitutional violation on which to base a [Section] 1983 conspiracy claim, a plaintiff's conspiracy claim fails as a matter of law." *Bertuglia* v. *City of New York*, 839 F. Supp. 2d 703, 728 (S.D.N.Y. 2012) (citation omitted); *see also, e.g.*, *Curley*, 268 F.3d at 72 ("Since plaintiff cannot establish a claim for false arrest or the use of excessive force, he may not maintain a [Section] 1983 cause of action for conspiracy."). "To survive a motion for summary judgment, [the] plaintiff's evidence of a [Section] 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Falls* v. *(Police Officer) Detective Michael Pitt*,

No. 16 Civ. 8863 (KMK), 2021 WL 1164185, at *58 (S.D.N.Y. Mar. 26, 2021) (internal citations omitted).

To state a claim of conspiracy under Section 1985(3), a plaintiff must show that there exists: "[i] a conspiracy [ii] for the purpose of depriving the plaintiff of the equal protection of the laws, or the equal privileges or immunities under the laws; [iii] an overt act in furtherance of the conspiracy; and [iv] an injury to the plaintiff's person or property, or a deprivation of her right or privilege as a citizen of the United States." *Thomas* v. *Roach*, 165 F.3d 137, 146 (2d Cir. 1999). "[T]he [Section 1985(3)] conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (internal quotation marks and citations omitted). "As with Section 1983 conspiracy claims, Section 1985 claims require a showing of an underlying constitutional violation." *Singer* v. *City of New York*, 417 F. Supp. 3d 297, 328 (S.D.N.Y. 2019) (internal citations omitted). Vague and unsupported assertions of a claim of conspiracy will not suffice under either Section 1983 or Section 1985(3). *See, e.g.*, *Wang* v. *Miller*, 356 F. App'x 516, 517 (2d Cir. 2009) (summary order); *Webb* v. *Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003); *Boddie* v. *Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Polur* v. *Raffe*, 912 F.2d 52, 56 (2d Cir. 1990).[18]

---

[18]   One court has described the difference between a Section 1983 and 1985 conspiracy claim as follows:

> A [Section] 1985(3) conspiracy claim is in one sense broader than a [Section] 1983 conspiracy claim because, unlike the [Section] 1983 claim, it does not require that a defendant be a state actor.

Plaintiff's conspiracy claims brought under either provision fail.  For starters, the Court has not found "constitutional violations that underlie" any of Plaintiff's conspiracy claims.  *Singer*, 417 F. Supp. 3d at 328.  As to Plaintiff's Section 1985 conspiracy claim, the Court has already discussed that the record is devoid of any indication that Defendants were motivated by any invidious discriminatory animus.  *See, e.g.*, *Favourite* v. *55 Halley St., Inc.*, 381 F. Supp. 3d 266, 284 (S.D.N.Y. 2019) ("Plaintiff has not shown that racial animus accounts for Defendants' conduct.  Accordingly, [p]laintiff's Section 1985 conspiracy claim must also be dismissed.").  Finally, there is simply no evidence tending to show a meeting of the minds between Williams and Complainant, or between Williams and any other officer, "'such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end,' augmented by 'some details of time and place and the alleged effects of the conspiracy.'"  *K.D. ex rel. Duncan* v. *White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (quoting *Romer* v. *Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)).  The Court has already discussed in depth the purported relationship between Complainant and Williams in the context of probable

---

In another sense, however, the conspiracy claim under [Section] 1983 is significantly broader because it allows a plaintiff to assert a deprivation of any right, privilege, or immunity secured by federal law, whereas a claim under [Section] 1985(3) is much more limited — it requires "racial, or perhaps otherwise class-based, invidiously discriminatory animus."

*Blount* v. *Swiderski*, No. 03 Civ. 23 (ENV) (ETB), 2006 WL 3314635, at *15 (E.D.N.Y. Nov. 14, 2006) (internal citations omitted).

cause, and without more, it cannot infer a conspiracy from limited testimony regarding a possible friendship between the two.

As such, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Section 1983 and 1985 conspiracy claims. Because "a [Section] 1986 claim must be predicated on a valid [Section] 1985 claim," Plaintiff's Section 1986 claim fails as well. *Brown* v. *City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999).

### 7. The Court Grants Summary Judgment as to Plaintiff's Remaining State Law Claims

The state law claims that remain include Plaintiff's assault and battery claim and his negligent hiring, retention, and supervision claim. Under New York law, a tort claim against municipalities or their officers may not be brought unless "a notice of claim shall have been made and served upon the city … in compliance with section fifty-e of this article[.]" N.Y. Gen. Mun. Law § 50-i(1). Section 50-e, in turn, requires that "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action … the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises[.]" N.Y. Gen. Mun. Law § 50-e(1)(a). "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." *Dingle* v. *City of New York*, 728 F. Supp. 2d 332, 348-49 (S.D.N.Y. 2010); *see also, e.g.*, *Norman* v. *City of New York*, No. 20 Civ. 5560 (LTS), 2022 WL 3354707, at *6 (S.D.N.Y. Aug. 12,

2022) ("Because [p]laintiff's failure to file a timely notice of claim renders this Court without jurisdiction to hear his state law tort claims, summary judgment is awarded to the City [d]efendants as to these claims."); *Schoolcraft* v. *City of New York*, 81 F. Supp. 3d 295, 300 (S.D.N.Y. 2015) (noting that "state notice-of-claim statutes apply to state law claims" brought in federal court, and that such statutes are "strictly construed" (internal citations and quotation marks omitted)).

Here, independent of the Court's finding that Defendants are entitled to summary judgment on the majority of Plaintiff's state law claims, the New York State Supreme Court has previously denied Plaintiff's petition for leave to file a late notice of claim alleging false arrest, false imprisonment, illegal search and seizure, and assault and battery.  (Gosling Decl., Ex. L at 1).  As such, these claims must be dismissed.  *See, e.g.*, *Swinton* v. *City of New York*, 785 F. Supp. 2d 3, 16 (E.D.N.Y. 2011) ("The failure to file a timely notice of claim against the City bars plaintiffs' state-law tort claims.…  And New York's Appellate Division already has affirmed the trial court's denial of plaintiffs' application to file a late notice.").  Moreover, there is no evidence that Plaintiff ever filed a notice of claim for his negligent hiring and supervision claim, likewise requiring dismissal of the claim.  *See, e.g.*, *Jewell* v. *City of New York*, No. 94 Civ. 5454 (DLC), 1995 WL 86432, at *1 (S.D.N.Y. Mar. 1, 1995) ("Any theory of liability omitted from the notice of claim may not be included in a subsequent

lawsuit.... [Plaintiff's] notice of claim failed to give the City adequate notice of any claim of negligent hiring.").[19]

## CONCLUSION

For the reasons stated in this Opinion, the Court GRANTS Defendants' motion for summary judgment as to all of Plaintiff's claims.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  January 5, 2023
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[19]  Because Williams, as an individual officer, is entitled to summary judgment on Plaintiff's false arrest and imprisonment, assault and battery, malicious prosecution, failure to intervene, malicious abuse of process, and equal protection claims, it follows that there can be no *respondeat superior* liability against the City of New York for these claims.  *See, e.g.*, *Yusuf* v. *City of New York*, No. 15 Civ. 5545 (EK) (ST), 2022 WL 393882, at *11 (E.D.N.Y. Feb. 9, 2022) ("Because [plaintiff] fails as a matter of law to establish individual liability against [police officer] for unreasonable stop, false arrest, and assault and battery, he cannot establish *respondeat superior* liability for those claims." (citing *Velez* v. *City of New York*, 730 F.3d 128, 137 (2d. Cir. 2013)).